# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| LUIS M. GOMEZ, | ) |
| Plaintiff, | ) Case  No. CV 08-05115 AJW |
| v. | ) |
| MICHAEL J. ASTRUE, | ) MEMORANDUM OF DECISION |
| Commissioner of the Social Security Administration, | ) |
| Defendant. | ) |

Plaintiff filed this action seeking reversal of the decision of the defendant, the Commissioner of the Social Security Administration (the "Commissioner"), denying plaintiff's application for disability insurance benefits and supplemental security income ("SSI") benefits. The parties have filed a Joint Stipulation ("JS") setting forth their contentions with respect to each disputed issue.

### Administrative Proceedings

The procedural facts are undisputed and are summarized in the joint stipulation. Plaintiff filed benefits applications on June 25, 2004, alleging disability beginning September 19, 2001 due to diabetes, blindness, hypertension, and hypercholesterolemia.  [JS 2; Administrative Record ("AR") 119, 202]. Plaintiff subsequently alleged disability due to a mental impairment as well. [AR 130, 311].  Plaintiff's application was denied initially and on reconsideration. [JS 2].  Following a total of three administrative hearings, an administrative law judge (the "ALJ") issued a written decision denying benefits on January 16,

2008. [JS 2; AR 19-29].  Plaintiff was represented by counsel during all three administrative hearings. [See AR 360-465].

The ALJ found that plaintiff had severe, medically determinable impairments consisting of diabetes mellitus with retinopathy and an affective mood disorder.  The ALJ also found that plaintiff had medically determinable impairments that were not severe, namely, hypertension, controlled, with no end-organ damage; a foot ulcer secondary to diabetes mellitus; borderline intelligence; and a history of alcohol abuse, "reportedly in remission." [AR 21-22].  The ALJ determined that plaintiff's impairments did not meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "listing").  [AR 22-23].  The ALJ assessed plaintiff's residual functional capacity ("RFC") as follows:

> [Plaintiff can] perform light work except that he is able to stand and/or walk up to four hours in an eight-hour workday or sit for eight hours in an eight-hour workday.  He can occasionally climb ramps or stairs, bend, stoop, crouch, kneel, or crawl, and is precluded from work requiring balancing, work around hazardous or fast moving machinery or unprotected heights, and work requiring binocular or depth perception. [Plaintiff] can perform work involving three or four step simple repetitive tasks in an object oriented, relatively habituated work setting. [Plaintiff] should not perform work activity requiring safety operations or hypervigilance, or work that entails intense interpersonal contact with co-workers, supervisors, or the general public.

[AR 23]. The ALJ found that plaintiff's RFC precluded him from performing his past relevant work, but did not preclude performance of jobs that exist in significant numbers in the national economy.  Accordingly, the ALJ concluded that plaintiff was not disabled at any time through the date of his decision. [AR 27-28]. The Appeals Council denied plaintiff's request for review. [AR 4-7].

## Standard of Review

The Commissioner's denial of benefits should be disturbed only if it is not supported by substantial evidence or is based on legal error. Stout v. Comm'r Social Sec. Admin., 454 F.3d 1050, 1054 (9th Cir. 2006); Thomas v. Barnhart, 278 F.3d 947, 954 (9th Cir. 2002).  "Substantial evidence" means "more than a mere scintilla, but less than a preponderance." Bayliss v. Barnhart, 427 F.3d 1211, 1214 n.1 (9th Cir. 2005).  "It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

1  Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005)(internal quotation marks omitted). The court is

2  required to review the record as a whole and to consider evidence detracting from the decision as well as

3  evidence supporting the decision.  Robbins v. Soc. Sec. Admin, 466 F.3d 880, 882 (9th Cir. 2006);

4  Verduzco v. Apfel, 188 F.3d 1087, 1089 (9th Cir. 1999). "Where the evidence is susceptible to more than

5  one rational interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be upheld."

6  Thomas, 278 F.3d at 954 (citing Morgan v. Comm'r of Soc. Sec. Admin., 169 F.3d 595, 599 (9th Cir.1999)).

7  **Discussion**

8  **Listing of impairments**

9  The ALJ found that plaintiff did not meet or equal section 12.04 of the listing, "Affective Disorders,"

10  or section 12.07 of the listing, "Somatoform Disorders." [AR 22-23]. Plaintiff contends that he has valid

11  IQ and other functional limitations that meet section 12.05 of the listing, "Mental Retardation," and

12  therefore that the ALJ erred in failing to find him disabled at step 3 of the sequential evaluation procedure.[1]

13  [See JS 6-17].

14  A claimant is presumptively disabled and entitled to benefits if he or she meets or equals a listed

15  impairment. To "meet" a listed impairment, a disability claimant must establish that his condition satisfies

16  each element of the listed impairment in question.  See Sullivan v. Zebley, 493 U.S. 521, 530 (1990);

17  Tackett v. Apfel, 180 F.3d 1094, 1099 (9th Cir. 1999).  To "equal" a listed impairment, a claimant "must

18  establish symptoms, signs, and laboratory findings" at least equal in severity and duration to each element

19  of the most similar listed impairment.  See Tackett, 180 F.3d at 1099-1100 (quoting 20 C.F.R. 404.1526); see

20  Sullivan, 493 U.S. at 531.

21  In order to meet most of the mental disorder listings, a claimant must demonstrate the existence of

22  

23  [1]    The Commissioner's regulations prescribe a five-step, sequential inquiry for evaluating

24  disability claims.  See 20 C.F.R. §§ 404.1520, 416.920.  The five steps are:  (1) Is the claimant
   engaging in substantial gainful activity? (2) Does the claimant have a severe impairment? (3) Does

25  the claimant's impairment or combination of impairments "meet or equal" an impairment listed in
   20 C.F.R. Part 404, Subpart P, Appendix 1? (4) Is the claimant capable of performing his or her past

26  work?  (5) Is the claimant able to do alternative work that exists in significant numbers in the
   national economy?  The inquiry stops, and the claimant is found "not disabled," if the answer is

27  "yes" at steps one, four, or five, or "no" at step two.  An affirmative answer at step three means that
   the claimant is disabled.  See Greger v. Barnhart, 464 F.3d 968,  971 (9th Cir. 2006); Tackett v.

28  Apfel, 180 F.3d 1094, 1098-1099 (9th Cir. 1999).

impairment-related functional limitations that are incompatible with the ability to do substantial gainful activity and that are the result of the mental disorder described in listing, which must be manifested by the medical findings specified for that disorder.  Section 12.05 does not follow that pattern.  "The structure of the listing for mental retardation (12.05) is different from that of the other mental disorders listings.  Listing 12.05 contains an introductory paragraph with the diagnostic description for mental retardation. It also contains four sets of criteria (paragraphs A through D). If [a claimant's] impairment satisfies the diagnostic description in the introductory paragraph and any one of the four sets of criteria, we will find that [the claimant's] impairment meets the listing." 20 C.F.R. Pt. 404, Subpt. P, App.1, § 12.00A.

The introductory paragraph of section 12.05 states: "Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22. [¶] The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied."  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05.

To satisfy section 12.05B, plaintiff must have "[a] valid verbal, performance, or full scale IQ of 59 or less[.]" To satisfy section 12.05C, plaintiff must have "[a] valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function[.]" 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05. When a claimant's verbal, performance, and full scale IQs differ, "the lowest of these [is used] in conjunction with 12.05." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00.6.c. While "it is preferable to use IQ measures" that "test both verbal and performance abilities," exceptions to this requirement may be made in "special circumstances, such as the assessment of individuals with sensory, motor, or communications abnormalities . . . ." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00.6.d.

**Plaintiff's IQ**

Dr. Clifford Taylor, one of the consultative psychological examiners who evaluated plaintiff, administered a battery of psychological tests, including the Wechsler Adult Intelligence Scale - Third Edition ("WAIS-III"), during his examination of plaintiff on May 15, 2006. [AR 314-320].  Dr. Taylor reported that plaintiff attained a verbal IQ of 61, a performance IQ of 60, and a full-scale IQ of 58, "placing him in the mild to moderate range of mental retardation on a measure of cognitive functioning.  His

1    intelligence is estimated to be in the low-average range."[2] [AR 316-317].  Dr. Taylor's psychological

2    diagnoses were depressive disorder not otherwise specified ("NOS"), and alcohol dependence, potentially

3    in remission. [AR 319].  He noted that plaintiff had a medical condition, diabetic retinopathy. [AR 319].

4           Dr. Taylor concluded that plaintiff's test results were of  "questionable validity." [AR 314]. Dr.

5    Taylor explained:

6           Consideration is given to embellishment of cognitive disorder.  It is not likely that he is

7           functioning in the moderate range of mental retardation.  He states that he has no activities

8           or hobbies during the day.  He failed the Rey-15 Item Memory Test - Second Edition, which

9           is a simple screener for malingering. He also produced an invalid MMPI-2, suggesting an

10          attempt to present himself in an overly disturbed manner. He slurred his words, stared off,

11          and appeared to be very disinterested in the testing.  He was prodded continually to give

12          effort to his ability, which did not improve his behaviors.

13   [AR 319]. Dr. Taylor opined that plaintiff had a moderate impairment in his ability to maintain attention,

14   concentration, and pace, and a mild impairment in his ability to understand, remember, and carry out job

15   instructions; interact with supervisors, coworkers, and the public; and adapt to day to day activities,

16   including attendance and safety. [AR 319].

17          During the February 2007 administrative hearing, plaintiff testified that he finished the eighth grade

18   and attended special education classes. [AR 410-411]. The medical expert, Dr. Soltz, testified that

19          The big problem I have is the 12.05 issue, and unfortunately we have an invalid and thought

20          to be malingering attempt at presenting himself on May 15 [2006]. If nothing else it was sub-

21          maximal effort. . . . The question now arises if he does have a history of being a special class

22          placement perhaps his IQ of 58 might be somewhere near what it is, but that's a pretty low

23          IQ, [and] . . . malingering and/or a lack of effort or basic indifference to the procedure was

24   _____

25          [2]   "In general an IQ of 70 or below indicates mental retardation (mild = 50/55-70; moderate
     = 35/40-50/55; severe = 20/25-35/40; profound = below 20/25); an IQ of 70-85 signifies borderline
26   intellectual functioning." Stedman's Medical Dictionary retardation (27th ed. 2000); see also Brown
     v. Sec'y of Health & Human Servs., 948 F.2d 268, 270 (6th Cir. 1991)(noting that "[t]he Diagnostic
27   and Statistical Manual of Mental Disorders (3d ed. 1987) ('DSM-III-R') distinguishes between four
     degrees of severity of intellectual impairment: mild, moderate, severe, and profound. I.Q. levels in
28   the range of '50-55 to approx. 70' are labeled as 'Mild Mental Retardation.'").

1    assessed during the evaluation.

2    [AR 415].  Dr. Soltz also noted that plaintiff testified that he stopped drinking in September 2006, but he was

3    still drinking when he was evaluated by Dr. Taylor in May 2006, and "that could've possibly caused some

4    deficiencies in [his] performance.  That's for sure." [AR 416].

5         Echoing these concerns about the validity of the test results obtained by Dr. Taylor, the ALJ

6    continued the hearing, ordered a second consultative examination, and asked plaintiff's attorney to try to

7    obtain plaintiff's educational  records. [See AR 416-419].  The ALJ also explained to plaintiff that "these

8    tests have what we call validity scores in them, which basically means in many cases they can tell whether

9    you're giving a best effort or whether you're just goofing off and you're not trying." [AR 419]. The ALJ

10   further admonished plaintiff that if he did not make his best effort, the test scores would

11            come back way out of balance  . . . [¶] So I'm going to warn you right now that these tests

12            can tell me whether or not you're giving a good example or good effort, and if you don't

13            give a good effort that's not going to impress me. . . .[¶] You need to be honest on these tests

14            and give them your best effort, and you'd be surprised what they can say.  They may not hurt

15            your case at all by giving you best effort.  By giving your best effort they may help your

16            case, but I can't tell you that unless you're honest with me and with the examiner . . . .

17   [AR 420].   Plaintiff said that he understood. [AR 420-421].

18        The Commissioner's second consultative examiner, Dr. Cash, evaluated plaintiff in June 2007. [AR

19   333-338].  He wrote that plaintiff was "cooperative.  He exhibited sufficient attention to test materials and

20   attempted to answer all questions he was presented with sufficient effort.  Modifications were made to the

21   testing due to reported . . . vision problems.  The remaining results are valid and interpretable." [AR 334].

22   Plaintiff recalled 12 items on the Rey 15 II test, a result that Dr. Cash described as "not consistent with an

23   attempt to malinger or dissimulate." [AR 335].   On the WAIS-III, which was "[m]odified due to vision

24   problems," plaintiff attained a verbal IQ of 63, placing him in the "extremely low" range. [AR 336]. The

25   "90% confidence interval" was 60-68.[3] [AR 336].  Plaintiff  "performed poorly on all subtests indicating

26

27        [3]    A "confidence interval" is used to indicate the reliability of a point estimate of a parameter.
     The confidence interval is a range of values above and below a point estimate and within which the
28   parameter is estimated to lie. The confidence interval is qualified by a confidence level, generally

6

deficits in verbal conceptualization, knowledge, and expression as well as number ability and sequential processing." [AR 336]. Plaintiff's MMPI-2 score "indicates he is depressed and having a very difficult time adjusting to his health problems but is not openly aware of acknowledging these difficulties. He is in a fair amount of distress but is in apparent denial about it. He is not attempting to exaggerate his deficits at this time." [AR 337].

Dr. Cash diagnosed depressive disorder NOS, learning disorder NOS, rule out borderline intellectual functioning. [AR 337]. Dr. Cash opined that plaintiff was moderately impaired in his ability to tolerate stress, mildly to moderately at risk of emotional deterioration in the workplace, and mildly impaired in his ability to understand, remember, and carry out simple job instructions; maintain attention, concentration, and pace; and get along with supervisors and coworkers. [AR 337].

A supplemental hearing was conducted in November 2007. Asked by the ALJ about the applicability of section 12.05 of the listing, Dr. Soltz said that plaintiff has "borderline intellectual functioning, which is not mental retardation. It will not meet any listings . . . ." [AR 429-430]. Dr. Soltz testified that he "would probably add [a limitation to] simple and repetitive tasks" to plaintiff's RFC "based upon that assessment of [plaintiff's] IQ. It's just hard to know what his IQ is." [AR 431]. Later, Dr. Soltz clarified that plaintiff "would have definite difficult[y] dealing with instructions and no greater than simple." [AR 431]. The ALJ asked Dr. Soltz whether "simple instructions and simple repetitive tasks" meant "one-step tasks." [AR 439]. Dr. Soltz replied, "I think three or four. . . [T]hat's what I think he's capable of doing based upon the record. . . . [H]e should be able to do three and four step tasks with a borderline IQ." [AR 439].

The ALJ ultimately found that plaintiff had a medically determinable impairment, specifically, "borderline intelligence." The ALJ found that plaintiff's borderline intelligence was not a severe impairment when considered independently. [AR 21-22]. Nonetheless, the ALJ adopted Dr. Soltz's

expressed as an estimate. A 90% confidence interval means that the investigator is 90% confident that the true estimate lies within the confidence interval. See Wikipedia, Confidence interval, at http://en.wikipedia.org/wiki/Confidence_interval (last visited Feb. 3, 2010); United States National Library of Medicine - National Institutes of Health, National Information Center on Health Services Research and Health Care Technology, Health Technology Assessment ("HTA") 101: Glossary, at http://www.nlm.nih.gov/nichsr/hta101/ta101014.html (last visited Feb. 3, 2010).

testimony that plaintiff's IQ would limit him to simple, repetitive tasks of no more than four steps, and he expressly incorporated that restriction into his RFC finding. [AR 21-22]. Thus, notwithstanding his finding at step two, the ALJ implicitly found that plaintiff's "borderline intelligence" had more than a minimal effect on his ability to work. See Webb v. Barnhart, 433 F.3d 683, 686 (9th Cir. 2006)(explaining that a medically determinable impairment or combination of impairments may be found "not severe only if the evidence establishes a slight abnormality that has no more than a minimal effect on an individual's ability to work.")(quoting Smolen v. Chater 80 F.3d 1273, 1290 (9th Cir. 1996)).  The ALJ made no specific findings regarding plaintiff's IQ.

To meet the "B" criteria of section 12.05, plaintiff must have a valid verbal, performance, or full-scale IQ of 59 or below.  Both Dr. Taylor, who administered the WAIS-III that yielded a full-scale IQ of 58, and Dr. Soltz, the medical expert, indicated that those IQ test results were invalid due to suboptimal effort or malingering on plaintiff's part.  Therefore, plaintiff's contention that he meets the "B"criteria of section 12.05 lacks merit.  See Soto v. Sec'y of Health & Human Servs., 795 F.2d 219, 222 (1st Cir. 1986)(holding that the ALJ is not obliged to accept an IQ "if there is a substantial basis in the record for believing that [the] claimant was feigning the results").

To meet the "C" criteria of section 12.05, plaintiff must have "[a] valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function[.]" 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05C.  As explained above, Dr. Cash, the consultative examiner, reported that plaintiff attained a verbal IQ of 63 on the WAIS-III, with a "confidence interval" of 60-68, within the range of 60-70 contemplated by section 12.05C. [AR 336].  His examination report does not support the inference that plaintiff's IQ test results were invalid or feigned. To the contrary, Dr. Cash commented that plaintiff was cooperative and put forth sufficient attention and effort, and he characterized plaintiff's IQ test results as "valid and interpretable." [AR 334].       When questioned about Dr. Cash's IQ test results, Dr. Soltz said that there was "likely sub-maximal effort" by plaintiff, and that he considered plaintiff's scores on the MMPI and the Rey 15 II test "suspicious." [AR 431].  On cross-examination by plaintiff's attorney, however, Dr. Soltz acknowledged that "there is no evidence from [Dr. Cash] himself" indicating that plaintiff made sub-maximal effort, and that Dr. Cash "did not say that." [AR 434].  While Dr. Soltz characterized plaintiff's Rey 15 II and MMPI-2 test results as "suspicious," Dr. Cash

1   vouched for their reliability. He specifically stated that plaintiff's Rey 15 II test results (12 out of a possible

2   15) were not consistent with malingering or dissimulation, and that plaintiff did not exaggerate his deficits

3   when taking the MMPI-2. [AR 335-337].

4         Citing Dr. Taylor's report, the ALJ noted that "[p]revious test results were proven invalid due to

5   malingering or sub-optimal effort and there is no evidence of record to suggest his performance during

6   recent testing is indicative of an inability to perform simple repetitive tasks in the workplace." [AR 22.] The

7   ALJ said that he gave "significant, but not total weight" to Dr. Cash's examination report, and "great

8   weight" to Dr. Soltz's testimony. [AR 26]. Although plaintiff's IQ test results from both Dr. Taylor and Dr.

9   Cash and the application of section 12.05 were addressed during the administrative hearings, the ALJ never

10  explicitly addressed those issues in his decision. The ALJ's silent disregard of the verbal IQ obtained by

11  Dr. Cash was error. See Lester v. Chater, 81 F.3d 821, 830-831 (9th Cir. 1995) (stating that an examining

12  physician's opinion can be rejected only for specific and legitimate reasons based on substantial evidence

13  in the record, and "[t]he opinion of a nonexamining physician cannot by itself constitute substantial

14  evidence that justifies the rejection of the opinion of either an examining physician or a treating physician");

15  cf. Fanning v. Bowen, 827 F.2d 631, 633-634 (9th Cir. 1987)(reversing and remanding for consideration

16  of whether the claimant met section 12.05 where the claimant's IQs "obtained during psychological testing

17  by two clinical psychologists ranged from a high of 76 to a low of 69, thereby satisfying the first prong of

18  section 12.05(C)")(footnote omitted); Williams v. Sullivan, 970 F.2d 1178, 1184 (3d Cir. 1992)(stating that

19  "a valid verbal scale IQ test administered by a qualified professional using the WAIS may be sufficient to

20  establish" mental retardation under the first prong of section 12.05C.

21        Defendant does not contend that the verbal IQ of 63 obtained by Dr. Cash was invalid, or that the

22  ALJ adequately explained why he ignored that score.[4]  Instead, defendant argues that the ALJ properly

23  relied on Dr. Soltz's testimony and other evidence suggesting that plaintiff had "mild functional limitations

24  [that] did not equal" any listing. [JS 12-13].  Defendant's argument lacks merit.

25  _____

26      [4]   Defendant cites the Appeals Council's decision denying review, which explained why the
    Appeals Council concluded that no change was warranted in the ALJ's decision. [AR 4-7]. Because

27  the Appeals Council denied plaintiff's request for review, the ALJ's decision is the Commissioner's
    final decision in this case, and only that decision is subject to judicial review. See 42 U.S.C. §

28  405(g).  The Appeals Council's decision cannot remedy legal defects in the ALJ's decision.

Because section 12.05 is structured differently than the other mental disorder listings, a claimant can meet the "A" through "C" criteria (but not the "D" criteria) without having to demonstrate a disabling, or even severe, level of mental functional impairment. See 20 C.F.R. Pt. 404, Subpt. P, App.1, §§ 12.00A, 12.05C. Therefore, the ALJ cannot disregard a valid IQ simply because other evidence in the record could support a finding of nondisability in the absence of such a score.

In an analogous Ninth Circuit case, the claimant contended that she met section 12.05C of the listing. She had IQs in the 60-70 range, and the doctor who administered the IQ test "specifically stated that the 'test results were a valid reflection of [the claimant's] current level of intellectual functioning." Thresher v. Astrue, 283 Fed.Appx. 473, 475 & n.5 (9th Cir. Jun. 19, 2008). The Ninth Circuit observed:

> Here the ALJ did suggest that [the claimant] was not functionally mentally retarded, but the ALJ's failure to reference § 12.05 and, in particular, Listing 12.05C makes it unclear whether the ALJ came to grips with the specific requirements of that section when she issued her decision. We do not doubt that an ALJ can decide that an IQ score is invalid. The regulations' inclusion of the word "valid" in Listing 12.05C makes the ALJ's authority clear. But here, while the ALJ pointed to the level of [the claimant's] functioning, she did not find that the score was invalid, and the listing does not speak to functioning--it speaks only to the IQ score itself. Thus, we remand to the Commissioner for clarification regarding the nature of the considerations applied at step 3 and, particularly, precisely what was decided and why.

Thresher, 283 Fed.Appx. at 475 (footnote omitted).

The Ninth Circuit also noted that it had "never decided what information is appropriately looked to in deciding validity," but that some courts have said that a score can be questioned on the basis of "other evidence" (without, however, explaining "exactly how other evidence impacts the validity of the score itself"), and that other courts require "some empirical link between the evidence and the score." Thresher, 283 Fed.Appx. at 475 n.6 (citations omitted). Thresher left that issue unresolved, but it suggests, at a minimum, that an ALJ should not find that "other evidence" renders an IQ invalid without explaining how that evidence impacts the validity of the score.

Defendant's contentions do not excuse the ALJ's silent disregard of plaintiff's verbal IQ of 63. First, the absence of a diagnosis of "mental retardation" does not preclude plaintiff from meeting section 12.05C

or invalidate his IQ of 63. [JS11-13; see AR 335, 429]. Section 12.05 does not require a diagnosis or finding of "mental retardation," but relies instead on valid IQs in conjunction with other evidence to establish "subaverage general intellectual functioning." See SSR 83-19, 1983 WL 31248, at *2 ("A finding that an impairment meets the listing will not be justified on the basis of a diagnosis alone.").[5] see also Christner v. Astrue, 498 F.3d 790, 793 (8th Cir. 2007)("[A] formal diagnosis of mental retardation is not required to fall within the confines of section 12.05. . . . The ALJ erred in giving any credence to the lack of a diagnosed mental deficiency in [this] case.").

Defendant's argument that plaintiff had a "semiskilled" work history that is not consistent with his IQ is contrary to the evidence as a whole. [See JS 11]. Based on plaintiff's disability reports and testimony, the vocational expert testified that plaintiff worked as: (1) a "labor landscaper," Dictionary of Occupational Titles ("DOT") job number 408.687-014, from 1994-1995; (2) an "assembler, electrical accessories I," DOT job number 729.687-010, from 1996-1997; and (3) an "assembler, production line," DOT job number 809.684-010, from 1997-2001. [AR 146, 447-448; see 115, 120, 142, 444-447].

Plaintiff testified that his landscaping job involved using a trenching tool to "make holes in the grass." [AR 444-445]. His earnings record indicates that he performed that job in 1994 and made $1,107.

---

[5] Because there are degrees of mental retardation, the functional difference between mild mental retardation and borderline intellectual functioning (which generally corresponds to an IQ over 70) will not be as pronounced as with more severe mental retardation. As explained by the Sixth Circuit,

> Mild Mental Retardation is roughly equivalent to what used to be referred to as the educational category of "educable." This group constitutes the largest segment of those with the disorder-about 85%. People with this level of Mental Retardation typically develop social and communication skills during the preschool years (ages 0-5), have minimal impairment in sensorimotor areas, and often are not distinguishable from normal children until a later age. By their late teens they can acquire academic skills up to approximately sixth-grade level; during their adult years, they usually achieve social and vocational skills adequate for minimum self-support, but may need guidance and assistance when under unusual social or economic stress. At the present time, virtually all people with Mild Mental Retardation can live successfully in the community, independently or in supervised apartments or group homes (unless there is an associated disorder that makes this impossible).

Brown, 948 F.2d at 270 (quoting the DSM-III-R).

1    [AR 115].  The ALJ did not include that job in his past relevant work finding. [AR 27].

2         Plaintiff said that he worked as an "electrical assistant" for "Danny Lamas" from 1996-1997, but

3    he did not have reported earnings from that job. [AR 115, 142].  In response to a question by the vocational

4    expert about the heaviest weight he had to lift in that position, he testified that he had to lift and carry wires

5    for that job, but he did not describe that job further in his testimony or vocational reports. [AR 446-447].

6    The vocational expert classified that job as an electrical accessories assembler position. [AR 146, 447-448].

7         Plaintiff reported that from 1997 until 2001, he worked as an "assembly line worker/machine

8    operator" for a company that manufactured truck windows. [AR 120]. His job involved "[c]utting materials

9    for window frames." [AR 120].  Plaintiff testified that he "used to put the latches on the – I used to make

10   windows for the trucks that were the Nissan, Silverado, Tacoma, the back window, the little one." [AR 447].

11   Plaintiff testified that he obtained that job through his brother-in-law.[6]  His last two jobs involved working

12   for his brother-in-law's brother.[7] He said that he got another job through (or from) his cousin's husband.

13   [AR 413].  Plaintiff testified that he was fired for "missing too many days," first because his mother died,

14   and because he started having problems with his eyes. [AR 413-414].

15        The DOT classifies the jobs of "laborer, landscape" and "assembler, electrical accessories I" as

16   requiring a "Specific Vocational Preparation" ("SVP") of "Level 2," defined as "[a]nything beyond short

17   demonstration up to and including 1 month."[8]  Those jobs also require "Level 2" reasoning development,

18   which is defined as the ability to "[a]pply commonsense understanding to carry out detailed but uninvolved

19

20   _____

21   [6]    Plaintiff's testimony and disability reports establishes that he lived with his sister and her
     family for 19 years. [AR 249, 316, 334, 367, 390-391].

22
23   [7]    Plaintiff's earning report indicates that except for earnings of $322 from "Corporate
     Personnel Network, Inc." in 2000, all of plaintiff's earnings from 1996 through 2001 came from one
     employer, C.R. Laurence Co. Inc. [AR 115-116].

24
25   [8]    "Specific Vocational Preparation" means "the amount of lapsed time required by a typical
     worker to learn the techniques, acquire the information, and develop the facility needed for average
26   performance in a specific job-worker situation." DOT, Appendix C, Components of the Definition
     Trailer (4th ed. rev.1991). "The DOT lists a specific vocational preparation (SVP) time for each
27   described occupation.  Using the skill level definitions in 20 C.F.R. 404.1568 and 416.968, unskilled
     work corresponds to an SVP of 1-2; semiskilled work corresponds to an SVP of 3-4; and skilled
28   work corresponds to an SVP of 5-9 in the DOT."  SSR 00-4p, 2000 WL 1898704, at *3

1    written or oral instructions. Deal with problems involving a few concrete variables in or from standardized

2    situations."[9]   The DOT job of "assembler, production line" also requires Level 2 reasoning development,

3    but it requires an SVP of 3, defined as "[o]ver 1 month up to and including 3 months."

4         Plaintiff's job as a production line assembler is considered semiskilled in the DOT, but the record

5    is ambiguous as to whether plaintiff's job as actually performed was semiskilled. That distinction matters

6    here, because defendant is arguing that an inconsistency exists between plaintiff's actual performance of

7    past work and his IQ. Moreover, the production line assembly job, like all of plaintiff's prior jobs, is

8    classified by the DOT as involving very limited reasoning skills.  Therefore, it is not inconsistent with a low

9    level of intellectual functioning.

10        In addition, plaintiff's work history was not extensive.  He was 39 years old when the ALJ issued

11   his decision. The evidence of record indicated that he had worked for a total of about seven years, and had

12   been terminated from his last job some seven years before the ALJ issued his decision. [See AR 115-116,

13   142].  Plaintiff's uncontroverted testimony was that he either obtained those jobs with the assistance of

14   relatives or actually worked for relatives.  Thus, the record as a whole does not support defendant's

15   contention that plaintiff's work history is materially inconsistent with an IQ signifying mild mental

16   retardation. See  Christner, 498 F.3d at 794 (holding that the claimant's intermittent work history as a tree

17   trimmer supported his IQ); Bailey v. Apfel, 230 F.3d 1063, 1065 (8th Cir. 2000)(holding that the ALJ erred

18   in rejecting the  IQ of a claimant whose "work history was limited primarily to working for his father");

19   Brown, 948 F.2d at 270 (holding that the claimant's ability to log mileage, hours worked, and the places he

20   drove in his job as a truck driver were not inconsistent with a valid IQ of 68); see generally Fanning, 827

21   F.2d at 634 (recognizing that if plaintiff otherwise meets section 12.05C, he "must be found disabled"

22   without consideration of his work history as a laundry loader, janitor, and dishwasher); cf. Williams, 970

23   F.2d at 1185 (holding that where the claimant had worked for 22 years in a steel drum factory and as a

24   security guard for about a year, the claimant's ability "to maintain a job for most of his adult life" called his

25

26      [9]      DOT job classifications include a "General Educational Development" ("GED") component
     comprising three   scales:   Reasoning   Development,   Math   Development,   and   Language
27   Development.  The GED reasoning, math, and language development scales range from Level 1
     (low) to Level 6 (high).  See DOT, App. C.
28

mental retardation into doubt).

Defendant also argues that plaintiff's educational history and school records are inconsistent with his IQ. That argument also lacks merit. Plaintiff testified that he finished eighth grade. He dropped out in ninth grade because he started "hanging out" with friends and "didn't really like" school. [AR 367-368, 386-387]. Plaintiff testified that he never obtained any other education or job training, and he did not get his GED. [AR 368]. Plaintiff's Los Angeles school records were submitted to the Appeals Council. [AR 352-359]. In a section of plaintiff's school records labeled "Summary of Observations of Educational Growth and Development [AR 354], plaintiff's first-grade teacher commented that plaintiff was "learning English slowly," could do math "fairly well," and "cannot read at all." His second-grade teacher said that plaintiff had made "slow progress in reading," and that she sent him to a first grade class because he needed "continual alphabet review." His math comprehension was "average." The teacher recommended diagnostic testing. [AR 354].

In fourth grade, plaintiff "was so far behind that I had him tested for possible special class placement. I hope that this is more suitable for him. He has difficulty relating with peers." Plaintiff was administered the Wide Range Achievement Test ("WRAT"), which measures reading recognition, spelling, and arithmetic computation. [AR 354; JS 7 n.2]. As a fourth-grader, plaintiff tested at grade levels 1.3, 1.1, and 3.0 in the three areas measured. Shortly after that test was administered, an Individual Educational Plan ("IEP) was written and approved. The nature of the IEP and whether or how it was implemented cannot be ascertained from the record; however, plaintiff testified that he had attended special education classes. [AR 411]. Plaintiff's fifth-grade teacher said that plaintiff was making "some progress" in reading and math. Plaintiff took the WRAT again in fifth grade. He tested at grade levels 2.4, 1.9, and 3.5 in the three areas measured. [AR 354]. In 1978, when plaintiff was 10 years old, a school official noted that he did not know how to write his last name. A recommendation was made for academic evaluation. [AR 358]. Plaintiff's sixth-grade teacher noted that plaintiff's school work was about fourth grade level. He had "trouble with children" and "does not follow school rules." [AR 354].

Plaintiff's testimony about his educational history and his school records do not provide substantial evidence for ignoring or rejecting his verbal IQ of 63. See Christner, 498 F.3d at 792, 794 (holding that the

record "did not belie" the claimant's IQ of 58 where he attended special education classes, did not live independently, and "dropped out of school at a low grade" (either in the sixth or eighth grade)); Markle v. Barnhart, 324 F.3d 182, 183-184, 187 (3d Cir. 2003)(holding that the record was not inconsistent with mental retardation meeting section 12.05 where the claimant dropped out in tenth grade, obtained a GED, and could read, write, add, and subtract, but had problems with multiplication and division); Bailey, 230 F.3d at 1065-1066 (holding that the ALJ erred in rejecting the IQ of a claimant who had been diagnosed with a learning disability and had taken special education classes in school); Brown, 948 F.2d at 269-270 (holding that completing sixth grade and a limited ability to read were not inconsistent with a valid IQ score of 68).

In addition, plaintiff's testimony and school records satisfy the requirement that plaintiff have manifested deficits in adaptive functioning "during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22." 20 C.F.R. Pt. 404, Subpt. P, App. 1, section 12.05. "The requirement of early onset and the reference to the claimant's 'developmental period'" in the introductory paragraph of section 12.05 "seem intended to limit coverage to an innate condition, rather than a condition resulting from a disease or accident in adulthood." Novy v. Astrue, 497 F.3d 708, 709 (7th Cir. 2007)(citation omitted).  IQ tests or other contemporary evidence of mental retardation prior to age 22 is not required to establish onset before that age.  Rather, the record "should contain some evidence" that permits an inference that the impairment existed before age 22 and is not of recent origin due to a traumatic event or some other changed circumstance.  Markle, 324 F.3d at 188-189.

Nothing in the record suggests that plaintiff's subaverage intellectual functioning was of recent origin.  Evidence regarding his educational history before age 22 permits the inference that his mental retardation had an onset date during the developmental period. See Christner, 498 F.3d at 793 (holding that "circumstantial evidence" existed supporting manifestation of the claimant's mental retardation before age 22, "including [the claimant's] low-grade dropout and participation in prior special education classes"); Markle, 324 F.3d at 189 (holding that evidence that the claimant took special education classes through the ninth grade, dropped out in tenth grade, "struggled" to obtain a GED, and had a limited work history supported a finding that onset of mental retardation occurred before age 22); Maresh v. Barnhart, 438 F.3d

897, 900 (8th Cir. 2006)(holding that the ALJ erred in finding that the claimant's mental retardation did not manifest itself before age 22 where the claimant attended special education classes, dropped out of school in ninth grade, had "trouble with reading, writing, and math," and had "frequent fights with other children").

For the reasons described above, the ALJ committed legal error in failing properly to evaluate whether plaintiff's mental impairment satisfied the introductory paragraph of 12.05 and the first prong of section 12.05C.

**Additional and significant work-related limitation of function**

To satisfy the second prong of section 12.05C, plaintiff must have "a physical or other mental impairment imposing an additional and significant work-related limitation of function." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05; see Hinkle v. Apfel,132 F.3d 1349, 1352 (10th Cir. 1997)("[T]he purpose of § 12.05C is to compensate a claimant with an IQ in the 60-70 range and a limitation of function that affects his work.")(quoting Sird v. Chater, 105 F.3d 401, 403 n.6 (8th Cir. 1997)). Following several other circuit courts, the Ninth Circuit has held that "an impairment imposes a significant work-related limitation of function when its effect on a claimant's ability to perform basic work activities is more than slight or minimal." Fanning, 827 F.2d at 633 (citing Pullen v. Bowen, 820 F.2d 105, 109 (4th Cir.1987); Cook v. Bowen, 797 F.2d 687, 690 (8th Cir.1986); Nieves v. Sec'y of Health & Human Servs., 775 F.2d 12, 14 (1st Cir.1985); and Edwards by Edwards v. Heckler, 755 F.2d 1513, 1515 (11th Cir.1985)).  The Ninth Circuit "emphasize[d] . . . that a finding of severity is not required to satisfy the more than slight or minimal effect standard."  Fanning, 827 F.2d at 633 n.3 (citing Edwards, 755 F.2d at 1515) (stating that a "significant" work-related limitation of function involves something more than "minimal" but less than "severe").  If the claimant has an additional physical or mental impairment "which was itself severe," that impairment "automatically satisfie[s] the more than slight or minimal effect standard."  Fanning, 827  F.2d at 633 n.3 (citing Nieves, 775 F.2d at 14).

After Fanning was decided, the Commissioner revised the regulations pertaining to the evaluation of mental disorders to clarify that for purposes of applying section 12.05C,

we will assess the degree of functional limitation the additional impairment(s) imposes to

determine if it significantly limits your physical or mental ability to do basic work activities,

1    i.e., is a "severe" impairment(s), as defined in §§ 404.1520(c) and 416.920(c). If the

2    additional impairment(s) does not cause limitations that are "severe" as defined in §§

3    404.1520(c) and 416.920(c), we will not find that the additional impairment(s) imposes "an

4    additional and significant work-related limitation of function" . . . .

5 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00A; see Markle, 324 F.3d at 188 (discussing the revised

6 regulations); see also Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury,

7 65 Fed.Reg. 50746, 50772 (Aug.  21, 2000).

8      The ALJ found that plaintiff had severe physical and mental impairments consisting of diabetes

9 mellitus with retinopathy and an affective mood disorder. [AR 21-22]. Therefore, under both Ninth Circuit

10 law and the Commissioner's newer, more demanding regulatory standard, plaintiff has "a physical or other

11 mental impairment imposing an additional and significant work-related limitation of function" within the

12 meaning of section 12.05.[10] See Fanning, 827  F.2d at 633 n.3; see also Markle, 324 F.3d at 188 (holding

13 that "[e]ven absent the Commissioner's clarifying regulation, the severity of [the claimant's] other

14 impairments (obstructive pulmonary disease, hypertension, obesity and gout) which limit him to some forms

15 of  light work constitute impairments 'imposing additional and significant work-related limitations of

16 function'"); Mowery v. Heckler, 771 F.2d 966, 973 (6th Cir. 1985) (holding that the second prong of the "C"

17 criteria in section 12.05 was satisfied where the claimant was limited to light or sedentary work).

18      For all of the foregoing reasons, the ALJ's step-three finding that plaintiff did not meet or equal a

19 listed impairment was not based on substantial evidence and is not free of legal error.

20    **Remedy**

21      The choice whether to reverse and remand for further administrative proceedings, or to reverse and

22 simply award benefits, is within the discretion of the court.  See Harman v. Apfel, 211 F.3d 1172, 1178 (9th

23 Cir.) (holding that the district court's decision whether to remand for further proceedings or payment of

24 benefits is discretionary and is subject to review for abuse of discretion), cert. denied, 531 U.S.  1038

25 (2000).  The Ninth Circuit has observed that "the proper course, except in rare circumstances, is to remand

26

27      [10]  This fortuity makes it unnecessary to decide whether Fanning remains good law after the

28 Commissioner's 2000 clarification of the regulations.

1  to the agency for additional investigation or explanation."  Moisa v. Barnhart, 367 F.3d 882, 886 (9th Cir.

2  2004) (quoting INS v. Ventura, 537 U.S. 12, 16 (2002) (per curiam)).   A district court, however,

3       should credit evidence that was rejected during the administrative process and remand for

4       an immediate award of benefits if (1) the ALJ failed to provide legally sufficient reasons for

5       rejecting the evidence; (2) there are no outstanding issues that must be resolved before a

6       determination of disability can be made; and (3) it is clear from the record that the ALJ

7       would be required to find the claimant disabled were such evidence credited.

8  Benecke v. Barnhart, 379 F.3d 587, 593 (9th Cir. 2004) (citing Harman, 211 F.3d at 1178). The Harman test

9  "does not obscure the more general rule that the decision whether to remand for further proceedings turns

10 upon the likely utility of such proceedings."  Harman, 211 F.3d at 1179; see Benecke, 379 F.3d at 593

11 (noting that a remand for further administrative proceedings is appropriate "if enhancement of the record

12 would be useful").

13       The ALJ failed to provide legally sufficient reasons for rejecting the verbal IQ of 63 obtained by Dr.

14 Cash.  There are no outstanding issues that must be resolved before a determination of disability can be

15 made, because the record establishes that as of the date his valid IQ was assessed by Dr. Cash, plaintiff met

16 all of the criteria for disability under section 12.05C of the listing.   Since it is clear from the record that the

17 ALJ would be required to find plaintiff disabled if that evidence were credited, the proper remedy is a

18 remand for the payment of benefits.[11]

19 ///

20 ///

21 ///

22

23

24

25                                **Conclusion**

26       For the reasons stated above, the ALJ's decision is not supported by substantial evidence and does

27 ─────────────────────

28    [11]   This disposition makes it unnecessary to consider plaintiff's remaining contentions.

not reflect application of the proper legal standards.  Accordingly, defendant's decision is reversed, and the case is remanded for an award of benefits consistent with this memorandum of decision.

February 10, 2010

_____
ANDREW J. WISTRICH
United States Magistrate Judge

19